IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 20, 2009

# IN RE B.L.S.C., D.L.S., & D.J.C.

**Appeal from the Juvenile Court for Dickson County**
**No. 06-08-046-CC     A. Andrew Jackson, Judge**

---

**No. M2008-02301-COA-R3-PT - Filed April 7, 2009**

---

Mother appeals a juvenile court order terminating her parental rights to her three children based upon four separate grounds. Finding clear and convincing evidence to support the juvenile court's determinations on the grounds of mental incompetence and persistence of conditions, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Hilary H. Duke, Dickson, Tennessee, for the appellant, S.L.S.C.

Amy Teresa McConnell and Douglas Earl Dimond, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Bradley Kyle Sanders, Dickson, Tennessee, Guardian Ad Litem.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Sherry S. is the mother of three children: B.L.S.C., a daughter born in 1992, D.L.S., a daughter born in 2003, and D.J.C., a son born in 2005. The Department of Children's Services ("DCS") first became involved with this family in June 2005 after Sherry S. was arrested on charges of child endangerment, reckless endangerment, and evading arrest. These charges arose out of an incident in which Sherry S. led police officers on a high-speed car chase with two-year-old D.L.S. in the car unrestrained. Sherry S. immediately entered an inpatient psychiatric facility where she was diagnosed with post-partum psychosis[1] with catatonia and a psychotic disorder. She had been under

---

[1] D.J.C. was born two months before the incident in June 2005.

the care of Centerstone, a community mental health agency, since March 1999 for a schizoaffective disorder, bipolar type.[2]

DCS filed a dependency and neglect petition on July 19, 2005, against Sherry S. and the children's father alleging that "[t]he mother of these children has serious mental health issues and the father has proved that he is either unable or incapable of protecting them." The court awarded DCS temporary custody of all three children. At an adjudicatory hearing[3] in June 2006, Sherry S. stipulated that the children were dependent and neglected at the time of their removal. The juvenile court found that the children were dependent and neglected and awarded custody to DCS. The court ordered that Sherry S. be allowed to have supervised visits with the children.

The first set of permanency plans for the three children was developed by DCS and signed by Sherry S. in August 2005. To achieve the goal of reunifying the children with their mother, the plan required Sherry S. to submit to a clinical mental health assessment and follow its recommendations; take all prescribed medications and report medication changes to DCS; notify her DCS case manager of mental health appointments; submit to an anger management assessment and follow all recommendations; meet the children's basic needs; and submit to a parenting assessment. The goal target date was August 12, 2006. These plans were approved by the juvenile court in October 2005.

In December 2005, Sherry S. began having supervised visits with her two youngest children once or twice a week. The oldest child did not want to visit her mother. The visitation case worker lost contact with Sherry S. in March 2006. In June 2006, Sherry S. contacted her case manager at DCS about resuming visitation. Centerstone case management notes for July 14, 2006, indicate that Sherry S. saw her two youngest children that day for the first time in about four months.

In a letter written on June 27, 2006, a nurse practitioner at Centerstone stated that Sherry S. had stayed on her medications for the past month and had kept four appointments during the month of June. The nurse practitioner observed that Sherry S. "sustained mental health when taking medications and living in a fairly stable environment."

In July 2006, the juvenile court found that, despite DCS's reasonable efforts, Sherry S. had not been compliant with the permanency plans because she had failed to maintain contact with DCS. The court acknowledged that Sherry S. had been compliant with her therapeutic appointments and medication during June 2006. In August 2006, the three children were placed with their father for a trial home visit, and he was given custody in September 2006. Sherry S. continued to have supervised visitation.

---

[2] In February 2005, Sherry S. received inpatient psychiatric care on two different occasions and was diagnosed with schizophrenia.

[3] This hearing pertained only to the mother.

Sherry S. received approval to move into public housing in early 2007. Immediately before this move, she was living with friends.

Another dependency and neglect petition was filed on July 18, 2007, and the three children were removed from their father's custody based upon allegations that he had sexually abused the oldest child.[4] Sherry S.'s therapeutic visits with the children were discontinued. According to the petition, the children's father was living with Sherry S. The children were again adjudicated dependent and neglected on November 30, 2007.[5]

On August 19, 2007, Sherry S. was admitted for a week of inpatient psychiatric treatment. She had recently learned of the allegations of sexual abuse against the children's father. The police found her running down her street without a shirt. In a report dated September 25, 2007, Centerstone classified Sherry S. as a person with severe and persistent mental illness. At some point, Sherry S. had to move out of public housing because the children's father had been staying there, but she was able to move into another public housing unit in January 2008. Sherry S.'s therapeutic visits with the two younger children were reinstated in February 2008.

DCS devised a new set of permanency plans dated August 16, 2007. The goal was to reunify the children with Sherry S. or to arrange relative custody with a target goal date of May 21, 2008. Sherry S. failed to attend several permanency plan meetings at DCS but did attend meetings on December 7, 2007 and February 21, 2008. Under revised permanency plans dated February 21, 2008, Sherry S. was required to continue individual therapy for mental health and anger issues; continue taking her mental health medications; submit to a psychological evaluation to include an I.Q. test; submit to a parenting assessment and follow the recommendations; demonstrate parenting skills during visitation; submit to an assessment to determine if she needed treatment as a non-offending parent; and learn to use public transportation. The revised plan was approved by the juvenile court in April 2008.

In a letter dated February 1, 2008, Sherry S.'s therapist at Centerstone, Michelle Lavallee, gave diagnoses of schizoaffective disorder, bipolar type, and borderline intellectual functioning. She stated that Sherry S. met with her case manager on a regular basis but had not been attending therapy regularly. Sherry S. often missed medication review appointments. In March 2008, Sherry S. was assigned to another counselor, Corena Harris, for insurance reasons.

On March 31, 2008, Sherry S. was admitted to an inpatient psychiatric facility after an incident when she went to her mother's nursing home while carrying a meat cleaver. According to the hospital treatment notes, Sherry S. thought her mother was the queen of Egypt and that she needed to protect her mother from terrorists. At discharge, Sherry S.'s diagnosis was bipolar affective disorder, manic; further evaluation was needed to rule out schizoaffective disorder. Ten days after her discharge,

---

[4]The father was eventually convicted of raping his daughter.

[5]The father notified the court that he wished to surrender his parental rights.

Sherry S. was arrested for public intoxication. She was readmitted to the same psychiatric facility on April 24, 2008, almost two weeks after her discharge, after reporting to emergency services workers that she was pregnant and about to go into labor. She again discussed her mother being royalty; she also talked about being related to or acquainted with several movie celebrities. Sherry S. was not pregnant. One of Sherry S.'s discharge medications was Eskalith, a form of lithium. In June 2008, laboratory results showed low lithium levels.

DCS filed a petition to terminate Sherry S.'s parental rights on June 6, 2008. The petition alleged the following grounds for termination: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with permanency plan; and (3) persistent conditions. In an amended petition filed on August 29, 2008, DCS added another ground for termination: (4) mental incompetence.

After a hearing on September 8, 2008, the trial court issued an order on September 17, 2008, terminating Sherry S.'s parental rights on all four grounds alleged in the petition.

## II. TESTIMONY AT HEARING

B.L.S.C., Sherry S.'s oldest child, was 16 at the time of the hearing. She testified that she did not want to visit with her mother because "I'm scared that she'll do something to me." B.L.S.C. described an incident when she awoke during the night to find her mother standing over her bed with a fireplace poker. B.L.S.C. took the poker from Sherry S., who said that she heard ghosts and noises. B.L.S.C. testified that she was afraid to spend time with her mother and wanted to stay with her foster family: "I think it would be best if we just got out of state's custody and had a natural life, because we have had state custody in and out all our life." She felt betrayed by her mother's consideration of reuniting with her father despite his sexual abuse of B.L.S.C.

Sherry S. testified that the Centerstone case managers brought her a box containing her medications every week. When asked about missing appointments with her therapist, Sherry S. stated that she had transportation problems. She admitted that she could call the TennCare van to take her to her appointments and that, after she had her phone disconnected, her caseworker called the bus to pick her up. Her Centerstone case manager had offered to help her with budgeting, but Sherry S. stated that she did not need help with budgeting. She recalled her therapist talking to her about assisted living but did not remember any details.

Sherry S. admitted telling a caseworker that she did not believe the father had raped B.L.S.C. and that she was considering marrying him. She later decided, however, that her children were more important to her than the father.

Sherry S. testified that she lived at the first public housing unit for a year and three months, including the year 2007. After being forced to leave that unit because of the father staying there, she lived with someone she met at the nursing home for about two months and then moved in with another friend. She moved into a smaller public housing unit in January 2008.

-4-

Michelle Lavallee, an outpatient therapist at Centerstone, testified that she provided therapy for Sherry S. from April 2007 through January 2008. During that period, Sherry S. attended three appointments with Ms. Lavallee and missed four or five appointments.

Alpha Grieco, a former Centerstone employee, became Sherry S.'s case manager in November 2006. Ms. Grieco testified that she was part of a continuous treatment team, which provided an intensive form of case management. Ms. Grieco delivered Sherry S.'s medication box to her every week and went to her home two or three times a week. In February 2007, she told Sherry S. about Aspire, a supported employment program that would help her develop job skills, and Sherry S. expressed interest in pursuing this opportunity. Ms. Grieco gave Sherry S. information about transportation and offered to help her with appointments. Ms. Grieco discussed the Aspire program with Sherry S. at subsequent visits. In July 2007, Sherry S. said she no longer wanted to have participation in Aspire as a goal since she did not feel it was necessary.

Elizabeth Littleton, a case manager at Centerstone, was assigned to Sherry S.'s case in August 2007 and was still working with her at the time of the hearing. Ms. Littleton continued the weekly medication box delivery. She would visit Sherry S. at other times as needed. Soon after Ms. Littleton became the case manager, Sherry S. was distressed about her rent and was about to have to move. From September 2007 through at least July 2008, Ms. Littleton provided Sherry S. with food about once a month. Sherry S. often needed assistance with activities of daily living, such as arranging TennCare transportation and budgeting. Ms. Littleton testified that Sherry S. talked to her about marrying the father and they discussed potential consequences of such a decision. At times, Ms. Littleton found community resources to help Sherry S. with her bills.

Ms. Littleton recalled going to Sherry S.'s home the day before she was admitted to the hospital in April 2008. Sherry S. was hitting herself and talking about attending boot camp in Georgia with several celebrities. She said that her mother was the queen of Georgia and Tennessee. Sherry S. believed that she was pregnant. She thought Ms. Littleton and her colleague were Britney Spears and Madonna.

In Ms. Littleton's experience, Sherry S.'s symptoms tended to worsen when change occurred: "[S]he just can't handle it a lot of times. She'll get overwhelmed."

Corena Harris, a therapist, began working with Sherry S. in March 2008. She recalled telling DCS that Sherry S. needed to be in an assisted living environment where there would be more structure and services available.

Kelly Alvarez, a therapeutic visitation worker at Residential Services, Inc. ("RSI"), conducted an assessment of Sherry S. in November 2005. The next month, Ms. Alvarez began supervising visits for Sherry S. with her two younger children. Ms. Alvarez also offered help to Sherry S. regarding budgeting, housing, employment, and parenting skills. Beginning in March 2006, Ms. Alvarez had trouble getting in touch with Sherry S., and she closed the case on April 19, 2006.

DCS case manager <u>Maryle Jane DeMoss</u> was assigned to Sherry S.'s case from July 2005 when the children initially came into DCS custody until September 2006 when the father obtained custody. She testified that Sherry S. was "intermittent with her performance" of the permanency plan. In the spring of 2006, Ms. DeMoss went to Sherry S.'s home after a period of time when she had lost contact. When she encountered Sherry S. walking along the road, Sherry S. "became belligerent with me and would not even accept a ride home from me."

<u>Robert S. Warren</u>, a DCS case manager, testified about the dependency and neglect petition filed in July 2007 after the investigation began into the father's abuse of B.L.S.C.

<u>Julia Watzlavick</u>, a DCS case manager, worked with Sherry S.'s case from July 2007 through February 2008. She testified about meeting with Sherry S. to discuss the permanency plans. Ms. Watzlavick stated that Sherry S. took the initiative to schedule an appointment with Ms. Harris after her insurance coverage would no longer cover visits with Ms. Lavallee. On cross-examination, Ms. Watzlavick acknowledged that the permanency plan developed in August 2007 stated that Sherry S. was in counseling for mental health issues, had stable housing, and used resources well for transportation and finding household goods.

<u>Mariah Dickerson</u>, DCS case manager, was assigned to the case in February 2008. She testified that she had offered to provide transportation for Sherry S. for her mental health appointments. Ms. Dickerson opined that Sherry S. had not satisfied the mental health goal of the permanency plan; she stopped going to individual counseling because she felt that she did not need it. Sherry S. did complete a parenting assessment at RSI but did not attend counseling for a nonoffending parent as recommended. In accordance with Ms. Harris's recommendation, Ms. Dickerson talked to Sherry S. about going into an assisted living environment, but Sherry S. declined to do so.

Ms. Dickerson stated that Sherry S. had talked to her about getting back together with the children's father after he got out of jail: "I asked her why she would want to be with a man that raped her daughter, and she said that [B.L.S.C.] was lying, that [the father] didn't do that to her." Ms. Dickerson recalled having more than one conversation with Sherry S. about this issue.

Although Sherry S. had been in stable housing since February 2008, Ms. Dickerson stated that "we've had to pay her bills because she stopped budgeting her income."

### III. STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, *6 (Tenn. Ct. App. Apr. 29,

2005). Pursuant to Tenn. Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code. Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## IV. ANALYSIS

Sherry S. challenges all four grounds for termination and argues that the court erred in finding that termination was in the best interest of the children.

### Mental incompetence

Tenn. Code Ann. § 36-1-113(g)(8)(B) authorizes a court to terminate parental rights based upon clear and convincing evidence of the following conditions:

> The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental

condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).[6]

With respect to this ground for termination, the trial court found that Sherry S. had been diagnosed with a schizoaffective disorder, bipolar type in May 2002 and had put her then two-year-old daughter's life in danger the last time she had unsupervised visitation. The trial court further noted that Sherry S. had been hospitalized for psychiatric reasons at least four times since the incident that led to the removal of the children. The May 2008 hospitalization was for delusions and self-harming behaviors. The trial court concluded that "[t]here is little chance that the conditions can be improved to such an extent that the children can be safely placed with her in the foreseeable future because since DCS first became involved with the children in June 2005 [Sherry S.] has been unable to maintain anything close to mental stability."

The evidence strongly supports the factual findings made by the trial court. After the children were removed from her custody, Sherry S. continued to exhibit breaks with reality and poor judgment. Her oldest child expressed a fear of Sherry S. According to the evidence presented at the hearing, Sherry S. received outpatient therapy and medication management, including weekly delivery of medications to her home, but was not consistently compliant with treatment. Despite Sherry S.'s love for her children and her strong desire to be reunited with them, her severe and persistent mental illness makes her a danger to them. There is ample evidence in the record to establish that Sherry S. suffers from persistent mental illness rendering her incapable of caring for her children. Clear and convincing evidence supports the trial court's conclusion that the requirements of Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) are met.

Treatment notes from three inpatient psychiatric facilities where Sherry S. received treatment were admitted into evidence. Sherry S.'s brief includes a cursory assertion that these records were "admitted by error of the Court and under objection of [Sherry S.]'s counsel into evidence in the trial court." This is the only statement in the brief regarding the admission of these records into evidence. There are no arguments or authorities given to support Sherry S.'s bare assertion that the admission of these records was erroneous. Thus, Sherry S. has failed to comply with Tenn. R. App. P. 27(a)(7), and we consider this issue waived. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 401 (Tenn. Ct. App. 2006).

Sherry S. emphasizes the State's failure to introduce expert testimony that her mental illness makes her unable to care for her minor children. She cites no authority, and we know of none, that requires the State to put on expert testimony on the issue of the effect of a parent's mental illness on his or her ability to parent children. In this case, Sherry S.'s persistent breaks with reality and poor

---

[6]Tenn. Code Ann. § 36-1-113(g)(8)(B)(ii) requires that termination be in the best interest of the child. The best interest analysis will be addressed in a later section of this opinion.

judgment, even with treatment, strongly support the conclusion that she is unable to care for her children. Sherry S. points to the testimony of Ms. Alvarez as indicating that she displayed appropriate affection toward her children during supervised visitation, respected the boundaries of the supervised visits, provided the children with snacks, and responded appropriately to the children's questions. While these behaviors are commendable, they do not negate the clear and convincing evidence that Sherry S. cannot consistently care for her children in an unsupervised, unstructured setting.

## Persistence of conditions

Tenn. Code Ann. § 36-1-113(g)(3) authorizes the termination of parental rights on the following grounds:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Sherry S.'s children were removed from her custody in June 2005 due to her mental illness. As discussed in the previous section, Sherry S. was hospitalized twice in 2008 with psychotic symptoms, and her mental condition remains unstable.

In addressing this ground for termination, the trial court concluded that Sherry S. "is still mentally unstable and she continues to require psychiatric hospitalizations." The court further discussed conditions that could reasonably lead to further neglect or abuse of the children:

> [Sherry S.] was recently hospitalized after she took a butcher knife to the nursing home with the intention of killing the terrorists who were threatening her mother who [Sherry S.] believed to be the Queen of Egypt. [Sherry S.] does not recall a subsequent psychiatric hospitalization. She lived with [the father] until he went to jail charged with the sexual abuse of their daughter, [B.L.S.C.]. Since the children came back into custody in July 2007 [Sherry S.] has had three (3) psychiatric hospitalizations. [Sherry S.] told the Family Services worker, Meri Dickerson, that she was going to remarry

[the father] when he was released from prison. Ms. Dickerson testified that, when she asked [Sherry S.] how she could marry the person who sexually abused her daughter, [Sherry S.] responded that the child was lying about the sexual abuse.

The court concluded that there was little chance these conditions would be remedied at an early date since it had been 34 months since the children had been removed from their mother's custody and DCS had made "reasonable efforts to help [Sherry S.] remedy them, to no avail." The court specifically cited Sherry S.'s treatment at Centerstone since 2005, including individual and group therapy, parenting education, and transportation assistance. We further note that Sherry S. has refused budgeting assistance despite problems with paying her bills and buying food and has rejected the suggestion of an assisted living environment with job training and other support.

The trial court also concluded that continuation of the parent-child relationship "greatly diminishes the children's chances of being placed into a safe, stable and permanent home." These children had been in state custody for almost three years at the time of the hearing. Although there is some evidence of sporadic efforts by Sherry S. to improve her situation, clear and convincing evidence supports the trial court's conclusion that Sherry S.'s mental illness and associated parenting deficiencies are not likely to improve at an early date. The oldest child has chosen not to see her mother for supervised visitation. These children need to be allowed to integrate completely into a permanent, stable home.

The evidence does not preponderate against the trial court's factual findings, and there is clear and convincing evidence to support the trial court's legal conclusions that the statutory elements of Tenn. Code Ann. § 36-1-113(g)(3) are met in this case.

A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 188 S.W.3d at 367. Having found clear and convincing evidence to support the trial court's determinations under the mental incompetence and persistence of conditions grounds, we deem it unnecessary to address the remaining two grounds.

<u>Best interest</u>

DCS was also required to prove by clear and convincing evidence that termination "is in the best interest of the child[ren]." Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d at 546. Tenn. Code Ann. § 36-1-113(i) lists factors to be considered by the court in making its best interest determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Ascertaining whether termination is in a child's best interest is necessarily a fact-intensive inquiry. *In re Giorgianna H.*, 205 S.W.3d 508, 523 (Tenn. Ct. App. 2006). Moreover, the best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Rather, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *Id.*

In concluding that it was in the children's best interest for parental rights to be terminated, the trial court cited several reasons. The trial court stated that Sherry S. "has not made changes in her individual conduct or circumstances that would make it safe for the children to go home" and that she was "unable to parent the children due to her mental health issues." The court also noted that "[Sherry S.] has not made lasting changes in her lifestyle or conduct after reasonable efforts by the State to help, so that lasting changes" did not appear to be possible. Despite 34 months of support from DCS, Sherry S. had been hospitalized for psychiatric problems at least seven times since DCS

-11-

became involved. The trial court further stated that Sherry S.'s "mental or emotional state would be detrimental to the children and/or would prevent her from effectively parenting the children."

Sherry S. asserts that "the State failed to show by clear and convincing evidence that the Appellant did not make an adjustment of circumstances, conduct or conditions." As stated above, the best interest inquiry requires the court to determine the relevancy and weight of each factor. Sherry S. emphasizes the testimony of Ms. Watzalavick, who was questioned about Sherry S.'s status at the time of the drafting of December 2007 permanency plans and who responded that Sherry S. seemed to be in compliance with some of the plan requirements "at that time." But other evidence, including the testimony of Ms. Dickerson, indicates that Sherry S. exhibited only intermittent progress and failed to accomplish most of the permanency plan goals.

Sherry S. also argues that the trial court failed to take into account the relationship between the minor children and their mother. She points to the testimony of Ms. Alvarez that the two younger children were happy to see their mother at supervised visits and that five-year-old D.L.S. told her mother in June 2008 that she wanted to live with her. Ms. Alvarez also gave the following observations about the children's reactions to the supervised visits: "[T]here's not too much to the visits. The kids are not sad to leave at the end. [Sherry S.]'s sad to leave, but the kids show no emotion either way. They don't ask about seeing her again." There is no dispute that the oldest child refused to visit with her mother. We cannot say that the evidence regarding the relationship between Sherry S. and her children conflicts with the trial court's best interest determination.

We believe there is clear and convincing evidence that termination of parental rights was in the best interest of these three children. Three years is a long time in a child's life. Given the severity and persistence of Sherry S.'s mental health problems, we agree with the trial court that it was in the best interest of the children for her parental rights to be terminated.

Costs of appeal are assessed against the appellant, Sherry S., for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE